IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOSEPH LAROSA AND DOMINICK LAROSA,

    Plaintiffs,

v.                        Civil Action No. 1:07CV78
                              (STAMP)
ANDREA PECORA, also known as Andrea Fucillo,
JENNIFER LAROSA WARD, CHRIS WARD,
VIRGIL D. LAROSA, SANDRA LAROSA
and CHEYENNE SALES CO., INC.,

    Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR SUMMARY JUDGMENT ON BEHALF OF
DEFENDANTS ANDREA PECORA, JENNIFER WARD, AND CHRIS WARD,
DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT ON BEHALF OF
DEFENDANTS VIRGIL DAVID LAROSA AND SANDRA LAROSA AND
DENYING DEFENDANT CHEYENNE SALES COMPANY, INC.'S
MOTION FOR SUMMARY JUDGMENT AND
DEFERRING RULING ON PLAINTIFFS' MOTION TO STRIKE
MARCH 11, 2008 JUDGMENT ORDER AS AN EXHIBIT TO
CHEYENNE SALES COMPANY, INC.'S MOTION AND ALL
REFERENCED TESTIMONY AND EXHIBITS FROM THE ARBITRATION**

I.   Procedural History

    The plaintiffs assert that the debtors, Virgil Benito LaRosa and Joan LaRosa, made several transfers that violated the West Virginia Uniform Fraudulent Transfers Act. Currently before this Court are the following fully-briefed motions: (1) motion for summary judgment on behalf of defendants Andrea Pecora, Jennifer Ward, and Chris Ward; (2) motion for partial summary judgment on behalf of defendants Virgil David LaRosa and Sandra LaRosa; and (3) defendant Cheyenne Sales Company, Inc.'s motion for summary

judgment.[1]  For the reasons set forth below, these motions for summary judgment are denied.[2]

## II. Facts

On or about August 18, 1982, the plaintiffs, Joseph and Dominick LaRosa (the "LaRosa brothers"), loaned $800,000.00 to Virgil Benito[3] and Joan LaRosa (the "debtors"). After the debtors defaulted on this loan, the LaRosa brothers filed suit in the United States District Court for the District of Maryland, ultimately obtaining a judgment (the "Judgment") for $2,844,612.87, plus $10,000.00 in attorney fees and costs.

On September 11, 2002, the LaRosa brothers, in an attempt to execute on the Judgment, filed a certification of judgment for registration in this Court, but all matters concerning this registration action were stayed when the debtors filed for Chapter 11 bankruptcy on November 19, 2003. The bankruptcy court, however, lifted this stay for the limited purpose of allowing this Court to determine the validity of the Judgment. Accordingly, on January 23, 2004, United States Magistrate Judge John S. Kaull held both that the Judgment was valid and that its registration in this Court

---

[1] Also pending before this Court is the plaintiffs' motion to strike the March 11, 2008 judgment order as an exhibit to Cheyenne's motion, and all referenced testimony and exhibits from the arbitration. This Court DEFERS ruling on this motion pending further development of the issues raised in that motion at trial.

[2] On March 13, 2009, this Court notified the parties, by letter, of its tentative rulings to deny the defendants' various motions for summary judgment.

[3] Virgil Benito LaRosa died during the summer of 2006.

was proper.[4] The LaRosa brothers, meanwhile, filed a proof of claim in the amount of $4,507,493.33 in the debtors' bankruptcy action.

On June 12, 2007, the LaRosa brothers filed the above-styled civil action under the West Virginia Uniform Fraudulent Transfers Act ("WVUFTA"), W. Va. Code §§ 40-1A-1 et seq., contending that defendants Andrea Pecora, also known as Andrea Fucillo, Jennifer LaRosa Ward, Chris Ward, Virgil David LaRosa, and Sandra LaRosa (the "individual defendants"), along with Cheyenne Sales Company, Inc. ("Cheyenne"),[5] engaged in, or benefitted from, fraudulent transfers meant to hinder the LaRosa brothers' attempts to satisfy the Maryland Judgment.[6] These alleged fraudulent transfers are numerous.

To begin, the LaRosa brothers state that, prior to the bankruptcy, the debtors and the individual defendants maintained an oral agreement that Cheyenne could use the real property located in Upshur County, West Virginia, for its operations. Nevertheless, on

---

[4]The magistrate judge's decision was affirmed by the Fourth Circuit Court of Appeals.

[5]Cheyenne is a coal tipple and cleaning facility located in Upshur County, West Virginia, on real property owned by the debtors' children, who happen to be the individual defendants in this case. Virgil Benito LaRosa was the sole shareholder of Cheyenne stock. Upon his death, the stock is now currently held by his estate.

[6]This case was originally before United States District Judge Irene M. Keeley in the United States District Court for the Northern District of West Virginia. This case was transferred to the undersigned judge on July 17, 2008.

November 3, 2003, only two weeks before filing for bankruptcy, the LaRosa brothers allege that the debtors and the individual defendants entered into a written agreement, entitled the "Renewal Lease," which conferred additional benefits on the individual defendants beyond the monthly rental payments of $5,000.00. Specifically, the renewal lease obligated Cheyenne to place $700,000.00 in an interest bearing escrow account that was to be used for reclamation costs associated with mining activities on the property. Any funds not used for reclamation were to be paid to the individual defendants as "deferred rent." Cheyenne's entire obligation under the renewal lease was personally guaranteed by the debtors.

Further, the complaint alleges that after the LaRosa brothers obtained the Judgment, Virgil Benito LaRosa choose to receive nominal compensation from Cheyenne and released day-to-day control over operations to his son and defendant Virgil David LaRosa. This allowed Virgil David LaRosa and the other individual defendants to allegedly receive approximately $8,500,000.00 in compensation and benefits from Cheyenne between 1996 and 2005.

Next, the complaint alleges that on January 25, 2001, Cheyenne and Huntington National Bank ("the bank") entered into a loan agreement, permitting Cheyenne to borrow up to $950,000.00 on a line of credit. The debtors pledged approximately $1,100,000.00 in marketable securities as collateral for this loan, an amount that exceeded obligations to the bank by $700,000.00. The LaRosa

brothers argue that despite their insolvency, the debtors and one or more of the individual defendants asked Cheyenne to draw down the maximum amount of credit available under the line of credit to pay the $700,000.00 into the escrow account outlined in the renewal lease.

Finally, the LaRosa brothers allege in the complaint that on July 6, 2003, the debtors transferred approximately $105,000.00 in unencumbered marketable securities to Cheyenne, leaving the debtors with less than $20,000.00 in marketable securities. Cheyenne used this money to purchase two twenty-year annuities in the amounts of $700,000.00 and $320,000.00, respectively.

At the close of discovery, the LaRosa brothers identified several additional transactions in which they allege that the debtors' assets were fraudulently transferred under the WVUFTA. These transactions are as follows:

> (1) Manipulation of prices paid by Regal Coal Sales, Inc.[7] to Cheyenne ("Regal price manipulation").
>
> (2) Excessive net income and compensation paid to Regal, Virgil David LaRosa, and Sandra LaRosa in an amount no less than $2,559,066.00 ("Regal compensation").
>
> (3) Creation and use of Regal to divert more profitable sales and opportunities from Cheyenne and Cherokee Processing, Inc.[8] ("Cherokee") for no less than $2,559,066.00 ("Cherokee business usurpation").

---

[7]Regal Coal Sales, Inc., a West Virginia corporation owned and operated by defendant Virgil David LaRosa, is in the business of buying and selling coal.

[8]Cherokee Processing, Inc., a West Virginia corporation owned and operated by defendant Virgil David LaRosa, is in the business of providing services to maintain mining permits.

5

(4) Virgil Benito LaRosa's loans to Cheyenne in the amount of $995,273.00 ("Virgil Benito LaRosa loans").

(5) Cherokee's failure to pay for employees it leased from Cheyenne ("Cherokee employee leasing").

(6) Reimbursement of alleged advances to Cheyenne from Regal in the amount of $331,131.00 ("Regal reimbursement").

(7) Rawhide[9] Tipple lease involving unknown amounts of unpaid rent ("Rawhide lease").

By these actions, the LaRosa brothers claim that the debtors fraudulently transferred all of their non-exempt personal property to prevent this personal property from being used to satisfy the Judgment. As relief, the LaRosa brothers are seeking to void the transfers and have this Court award them both the ownership and beneficial interests in the proceeds.

### III. Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come

---

[9]Cheyenne operates a coal loading and processing facility in Upshur County, West Virginia, often referred to as the "Rawhide Tipple."

6

forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The Court must perform a threshold inquiry to determine whether a trial is needed--whether, in other words, "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.") (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is not appropriate until after the non-moving party has had sufficient

7

opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 812 F.2d 73, 78 (4th Cir. 1990), cert. denied, 502 U.S. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Discussion

The National Conference of Commissioners on Uniform State Laws adopted the Uniform Fraudulent Transfer Act in 1984. See generally Uniform Fraudulent Transfer Act (contained in 7A Uniform Laws Annotated 274 (West 1999)). The Act was designed to protect unsecured creditors against debtors who make transfers out of, or make obligations against, the debtor's estate in a manner adverse to the creditors' rights. See Uniform Fraudulent Transfer Act, § 3, cmt. 2 ("[T]he purpose of the Act [is] to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors."). West Virginia adopted the Act in 1986. See 1986 Acts of the Legislature, Chapter 166. In their complaint, the plaintiffs are asserting claims pursuant to sections 40-1A-4(a)(1), 40-1A-4(a)(2), and 40-1A-5(a) of the WVUFTA.[10]

---

[10] West Virginia Code §§ 40-1A-4(a)(1) and 40-1A-4(a)(2) are further discussed below. West Virginia Code § 40-1A-5(a) states, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

8

This Court must decide if there is sufficient evidence to raise a genuine issue of material fact concerning whether a fraudulent transfer did occur. The WVUFTA provides the following definition of "transfer:"

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance.

W. Va. Code § 40-1A-1(l). Transfers by debtors are "fraudulent if made under certain circumstances." Rich v. Rich, 405 S.E.2d 858, 860 (W. Va. 1991). West Virginia Code § 40-1A-4(a) states, in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor[.]

The WVUFTA sets forth "badges of fraud" to aid a court in determining whether the debtor made a transfer, or incurred an obligation, with the actual intent to hinder, delay, or defraud creditors:

> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

W. Va. Code § 40-1A-4(b). "Proof of the existence of any one or more of the factors enumerated in [W. Va. Code, 40-1A-4(b)] may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation." Nicholas Loan & Mortgage, Inc. v. W. Va. Coal Co-op, Inc., et al., 547 S.E.2d 234, 240 (W. Va. 2001) (citing Uniform Fraudulent Transfer Act, § 4, cmt. 5). Upon this cursory overview of the WVUFTA, this Court now addresses each of the defendants' motions for summary judgment.

A.  <u>Motion for Summary Judgment on Behalf of Defendants Andrea Pecora, Jennifer Ward, and Chris Ward</u>

The individual defendants advance three bases for their summary judgment motion. First, the WVUFTA requires a transfer of debtors' assets, and the debtors' assets were not transferred to, or for the benefit of, these individual defendants through either the Cheyenne line of credit or the renewal lease. Rather, the individual defendants specifically contend that they were not parties to the alleged fraudulent transfer of $1,020,000.00 under the Cheyenne line of credit because no proceeds were transferred to them, and the Cheyenne annuities were purchased by Cheyenne, issued in the name of Cheyenne, and withdrawn by Cheyenne. Similarly, the individual defendants claim that because neither the debtors nor Cheyenne have made any rental payments, the debtors' assets have not been transferred under the renewal lease, and that any deferred rental obligation under this lease is that of Cheyenne's.

Next, the individual defendants argue that the statute of limitations on the plaintiffs' claim concerning Cheyenne's line of credit has run. West Virginia Code § 40-1A-9 states that a party must bring a claim arising under the WVUFTA "within four years after the transfer was made or the obligation was incurred, or if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." The individual defendants argue that the debtors transferred their property as security for Cheyenne's line of credit on or about

January 25, 2001, and that because the complaint was not filed until June 12, 2007, the plaintiffs' line of credit claim is time-barred by the applicable statute of limitations.

As their final basis for summary judgment, the individual defendants assert that several of the alleged fraudulent transfers did not involve the transfer of the debtors' property, but rather property belonging to Cheyenne.[11] "The fact that a parent corporation has an ownership interest in a subsidiary . . . does not give the parent any direct interest in the assets of the subsidiary." Kreisler v. Goldberg, 478 F.3d 209, 214 (4th Cir. 1007)(emphasis included). Thus, because the debtors only retained stock in Cheyenne, any fraudulent transfers that Cheyenne may have made did not involve the transfer of assets that belonged to the debtors.

The plaintiffs go to great lengths to oppose the individual defendants' motion for summary judgment, outlining and describing each alleged fraudulent transfer, only to remind this Court that

> [b]y segregating each of the alleged transfers or elements of the alleged transfers, and analyzing each within a vacuum without reference to the other components or parts of a particular transfer, the Individual Defendants hope to have the court lose sight of the forests as a result of their extreme close-up of the knot-holes of each tree.

---

[11] These transactions include the following: Regal price manipulation transaction, Regal compensation transaction, Cheyenne line of credit transaction, Cherokee business usurpation transaction, Renewal Lease transaction, Cherokee employee leasing transaction, and Regal reimbursement transaction.

(Pls.' Br. Summ. J. 4.) Rather, the plaintiffs urge that "[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." In re Allou Distribs, Inc., 379 B.R. 5, 21 (E.D.N.Y. 2007) (internal citations omitted). In their plan, the debtors, as the plaintiffs allege, designed a scheme utilizing their assets in Cheyenne to adversely affect the plaintiffs' ability to recover against them. In support of this argument, the plaintiffs assert that the record is replete with badges of fraud that clearly demonstrate that the debtors made a transfer, or incurred an obligation, with the requisite intent to delay, hinder, or defraud their creditors.[12] Moreover, the plaintiffs contend that the individual defendants' statute of limitations argument concerning Cheyenne's line of credit is barred because of a previous order entered in this case. As such, the plaintiffs state that genuine issues of fact remain precluding summary judgment.

After a thorough review of the record, this Court must agree with the plaintiffs that summary judgment is inappropriate. Foremost, this Court finds the individual defendants' statute of limitations argument concerning the Cheyenne line of credit

---

[12]The plaintiffs claim that the following badges of fraud exist in this case: (1) the transfer was made to an insider, that is, a family member or corporation of which the debtor is a director, officer or person in control; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the debtor was insolvent or became insolvent shortly after the transfer was made; (4) the transfer was of substantially all the debtor's assets; and (5) the transfer was made at a time when the debtor had been sued. See W. Va. Code § 40-1A-4(b).

13

meritless. In asserting this argument, the individual defendants neglect to mention that Judge Keeley formed the law of the case concerning this issue in a previously entered memorandum opinion and order. See LaRosa v. Pecora, et al., 2007 WL 4225074 (N.D. W. Va. Nov. 27, 2007). In that opinion, Judge Keeley denied Cheyenne's motion to dismiss based upon several arguments for dismissal, one of which was that the plaintiffs' line of credit claim was barred by the applicable statute of limitations. Id. at 8. The plaintiffs claimed that the alleged fraudulent transfer triggering the statute of limitations was the actual draw downs on the line of credit which occurred less than four years prior to the plaintiffs filing their complaint. Id.

In denying this basis for dismissal, Judge Keeley relied upon Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981), a case arising under the Bankruptcy Code which held that an obligation is incurred under a guaranty line of credit when the principal obligor draws on the line of credit:

> Although it analyzes provisions of the bankruptcy code, Rubin nevertheless is helpful here, where under the Uniform Fraudulent Transfers Act, Cheyenne has argued that the transfers and obligations at issue were incurred when the Debtors executed their principal guarantees and created the various security interests under them. The Second Circuit rejected this same argument, finding that "[e]ven after the guarantees were executed, there could be no liability under them until [the bank] had actually loaned money to [the principal obligors]." It thus concluded that, "until the loans were made, there existed only a framework through which the guarantors] might incur obligations, but they had not done so yet."
>
> The Court finds the reasoning in Rubin persuasive and will follow it here. Therefore, because the Complaint

14

> was filed within four years of Cheyenne's draw down on the line of credit, the LaRosa Brothers Complaint is not time-barred by the applicable statute of limitations.

LaRosa, 2007 WL 4225074 at *8 (internal citations omitted).

This Court must agree with the plaintiffs that Judge Keeley's decision became the law of the case, and that the individual defendants cannot now raise this statute of limitations defense for the second time in an attempt to change it. "The law provides that a prior decision should be binding upon subsequent stages in the litigation between the parties. The purpose of the rule is to promote finality, consistency and efficiency." Vortekx, Inc. v. IAS Commc'ns, Inc., 72 F. Supp. 2d 638, 640 (N.D. W. Va. 1999) (internal citations omitted). The individual defendants present no manifest errors of law or fact that would require this Court to depart from Judge Keeley's prior holding. See Arizona v. California, 460 U.S. 605, 618 ("Under the law of the case doctrine . . . it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice."). Thus, this argument for summary dismissal lacks merit.

Furthermore, summary judgment is inappropriate because genuine issues of material fact remain in this case, including, but not limited to, whether the transfer of assets occurred, and if so, whether it was the debtors' property transferred, whether such property was transferred without receiving a reasonably equivalent value, and/or whether the property was transferred with the actual

intent to hinder, delay, or defraud the debtors' creditors. Moreover, the plaintiffs have brought to this Court's attention several badges of fraud that although they do not create a presumption of a fraudulent transfer, certainly remain relevant evidence. See Nicholas Loan & Mortgage, Inc., 547 S.E.2d at 240 (citing Uniform Fraudulent Transfer Act, § 4, cmt. 5). "The finder of fact is best situated to take into account all indicia negativing as well as those suggesting fraud." Id. (citing Uniform Fraudulent Transfer Act, § 4, cmt. 6).

Where a reasonable jury could draw different conclusions as to liability from the facts in evidence, summary judgment must be denied. Pierce v. Ford Motor Co., 190 F.2d 910, 915 (4th Cir. 1951). In this case, the plaintiffs' alleged fraudulent transfer claims present genuine factual issues that can properly be resolved only by a finder of fact. Whether the debtors fraudulently transferred their assets in an attempt to defraud their creditors is a genuine issue of material fact that may reasonably be resolved in favor of either party on the evidence in the non-jury trial of this case.[13] Accordingly, summary judgment must be denied.

---

[13]Denying a summary judgment motion is appropriate even where the parties request a bench trial, and the Court ultimately becomes the trier of fact. See e.g. Stratton Oakmont, Inc. v. Vaswani Place Corp., 188 F.3d 503, 503 (4th Cir. 1999) (denying parties cross motions for summary judgment and proceeding to bench trial) (unpublished); Monahan v. County of Chesterfield, Va., 95 F.3d 1263, 1272 (4th Cir. 1996) (recognizing that case could proceed to non-jury trial after a denial of both parties' summary judgment motions); Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 372 F. Supp. 2d 833, 834 (E.D. Va. 2005) (holding a bench trial following various summary judgment rulings).

B.  Motion for Partial Summary Judgment on Behalf of Defendants Virgil David LaRosa and Sandra LaRosa

The motion for partial summary judgment on behalf of defendants Virgil David LaRosa and Sandra LaRosa advances the same arguments as, and is identical to, the individual defendants' motion for summary judgment discussed in Part IV.A of this memorandum opinion and order.  Accordingly, for the reasons set forth by this Court in denying the individual defendants' motion for summary judgment, the motion for partial summary judgment on behalf of defendants Virgil David LaRosa and Sandra LaRosa is also denied.

C.  Defendant Cheyenne Sales Company, Inc.'s Motion for Summary Judgment

Cheyenne's motion for summary judgment addresses many of the same arguments as those addressed in the individual defendants' and Virgil David LaRosa and Sandra LaRosa's motions for summary judgment.[14]  In accordance with this Court's findings above, those arguments lack merit and do not warrant summary judgment in this matter.  Alternatively, however, Cheyenne argues that its business transactions were made in the ordinary course of business, and thus, constitute a valid defense to any alleged fraudulent

---

[14]Cheyenne argues that the plaintiffs' claim concerning Cheyenne's line of credit is time-barred by the statute of limitations, and that any transfers made by Cheyenne did not involve the transfer of assets belonging to the debtors.

transfers made.  The plaintiffs claim that Cheyenne has failed to provide this Court with any support for this defense.

A transfer is not voidable "[i]f made in the ordinary course of business or financial affairs of the debtor and the insider." W. Va. Code § 40-1A-8(f)(2).  "Whether a transfer was made in the 'ordinary course' requires a consideration of the pattern of payments or secured transactions engaged in by the debtor and the insider prior to the transfer challenged."  See Uniform Fraudulent Transfer Act § 8, cmt. 6.  This Court finds that whether Cheyenne engaged in these transactions within the ordinary course of business is a factual question that this Court as the fact-finder at trial must consider.  Summary judgment, therefore, is inappropriate, and Cheyenne's motion must be denied.

V. Conclusion

For the above-stated reasons, the motion for summary judgment on behalf of defendants Andrea Pecora, Jennifer Ward, and Chris Ward is DENIED; the motion for partial summary judgment on behalf of defendants Virgil David LaRosa and Sandra LaRosa is DENIED; and the defendant Cheyenne Sales Company, Inc.'s motion for summary judgment is DENIED.  Furthermore, this Court DEFERS a ruling on the plaintiffs' motion to strike the March 11, 2008 judgment order as an exhibit to Cheyenne's motion and all referenced testimony and exhibits from the arbitration pending further development of the issues raised in that motion at trial.

IT IS SO ORDERED.

The Clerk is directed to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:    March 30, 2009

>   /s/ Frederick P. Stamp, Jr.
>   FREDERICK P. STAMP, JR.
>   UNITED STATES DISTRICT JUDGE