IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOSEPH LAROSA and DOMINICK LAROSA,

      Plaintiffs,

v.                                 Civil Action No. 1:07CV78
                                                  (STAMP)

ANDREA PECORA, a/k/a Andrea Fucillo,
JENNIFER LAROSA WARD, CHRIS WARD,
VIRGIL D. LAROSA, SANDRA LAROSA
and CHEYENNE SALES CO., INC.,

      Defendants.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### I.  Procedural History

Plaintiffs, Joseph LaRosa and Dominick LaRosa (hereinafter sometimes referred to as the "LaRosa brothers"), filed this civil action under the West Virginia Uniform Fraudulent Transfers Act ("WVUFTA"), W. Va. Code §§ 40-1A-1, et seq., contending that defendants, Andrea Pecora also known as Andrea Fucillo, Jennifer LaRosa Ward, Chris Ward, Virgil David LaRosa and Sandra LaRosa (hereinafter sometimes referred to as "individual defendants"), along with Cheyenne Sales Co., Inc. ("Cheyenne"), engaged in or benefitted from fraudulent transfers meant to hinder the LaRosa brothers' attempts to satisfy a judgment they had obtained in the United States District Court for the District of Maryland against Virgil Benito LaRosa and Joan LaRosa (hereinafter sometimes referred to as the "debtors") in the amount of $2,844,612.87 plus $10,000.00 in attorneys' fees and costs. The complaint in this

civil action was filed on June 12, 2007. This civil action was originally assigned to the Honorable Irene M. Keeley who conducted a number of pretrial proceedings, including the entry of an order denying motions to dismiss by the individual defendants and by Cheyenne which was entered on November 27, 2007. On July 17, 2008, this civil action was reassigned to the undersigned judge. Following further discovery, pretrial proceedings and rulings on various motions, this case proceeded to a non-jury trial which was conducted from May 27, 2009 through May 29, 2009, and from June 1, 2009 through June 8, 2009. Thereafter, the parties filed proposed findings of fact and conclusions of law and written closing arguments. Subsequently, the plaintiffs settled this action as to Andrea Pecora, also known as Andrea Fucillo, Jennifer LaRosa Ward and Chris Ward. Thereafter, the plaintiffs and Virgil David LaRosa (sometimes referred to herein as Virgil D. LaRosa) and Sandra LaRosa, the non-settling defendants, filed revised closing arguments and revised proposed findings of fact and conclusions of law.

Based upon this Court's review of the evidence, upon the resolution of any factual disputes after giving due consideration to the credibility of witnesses and the various documents produced as exhibits and based upon this Court's review of the applicable law, this Court, pursuant to Federal Rule of Civil Procedure 52(a), hereby makes the following findings of fact and conclusions of law

and finds that plaintiffs are entitled to judgment for the reasons and in the amounts hereinafter set forth, subject to any set-off that may be determined to be appropriate through the settlement amount obtained from the settling defendants, Andrea Pecora, also known as Andrea Fucillo, Jennifer LaRosa Ward, and Chris Ward.

## II. <u>Findings of Fact</u>

1.  Virgil B. LaRosa, sometimes hereafter referred to as Virgil Benito LaRosa, and Joan LaRosa ("debtors") are the parents of Virgil David LaRosa, Jennifer Ward and Andrea Pecora also known as Andrea Fucillo.

2.  Virgil David LaRosa is the husband of defendant, Sandra LaRosa.

3.  Virgil B. LaRosa died on June 17, 2006.

4.  Chris Ward is the husband of defendant, Jennifer LaRosa Ward.

5.  Defendants, Andrea Pecora Fucillo, Jennifer LaRosa Ward and Chris Ward, have settled with the plaintiffs in this case and have been dismissed as defendants.

6.  On or about August 18, 1982, the debtors, Virgil B. LaRosa and Joan LaRosa, executed a promissory note in the amount of $800,000.00 to plaintiffs Joseph LaRosa and Dominick LaRosa, who are brothers.  Under the terms of that note, Joseph LaRosa and Dominick LaRosa were authorized under certain conditions to confess judgment against the debtors in the amount of the note plus

interest, costs and attorneys' fees of 15% if there was a default on that note.

7.   On or about October 25, 1994, the United States District Court for the District of Maryland entered an order confessing judgment against the debtors in a collection action filed against them by plaintiffs, Joseph LaRosa and Dominick LaRosa.

8.   On or about November 3, 1994, the United States District Court for the District of Maryland entered judgment in favor of the plaintiffs in the amount of $2,844,612.87 (the "judgment") plus $10,000.00 for attorneys' fees.

9.   On September 11, 2002, the plaintiffs caused the judgment obtained against the debtors from the United States District Court for the District of Maryland to be registered in the United States District Court for the Northern District of West Virginia.

10.  On January 23, 2004, the United States District Court for the Northern District of West Virginia entered an order affirming the validity of the judgment entered in the United States District Court for the District of Maryland against the debtors and in favor of Joseph LaRosa and Dominick LaRosa, the LaRosa brothers.

11.  On September 3, 2004, the United States Court of Appeals for the Fourth Circuit affirmed the January 23, 2004 order and opinion of the United States District Court for the Northern District of West Virginia, which upheld the validity of the

judgment entered in the United States District Court for the District of Maryland.

12. This judgment was indexed in several West Virginia counties, each of which then gave rise to a judgment lien on real property in those counties owned by the debtors.

13. Thereafter, plaintiffs Joseph LaRosa and Dominick LaRosa caused a number of suggestions of personal property to be served upon various banks and businesses including Regal Coal Company, Inc., and Cheyenne Sales Co., Inc. ("Cheyenne") and financial institutions in West Virginia, to which some responses were made. The amount of judgment, exclusive of the $10,000.00 in attorneys' fees plus interest accrued pursuant to 28 U.S.C. § 1964 as of July 31, 2009 is $6,799,161.42.

14. On November 19, 2003, the debtors, Virgil B. LaRosa and Joan LaRosa, filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Northern District of West Virginia. At the time of this bankruptcy, the debtors' assets amounted to $3,373,653.98 and their liabilities totaled $5,021,751.00.

15. In their schedule of personal property filed with the United States Bankruptcy Court in their bankruptcy proceeding, the debtors indicated that their equity interest in Cheyenne had no current market value. Virgil David LaRosa has never held an ownership interest in Cheyenne. Debtors Virgil B. LaRosa and Joan

5

LaRosa did not identify in their statement of financial affairs in the bankruptcy proceeding their agreement to guarantee Cheyenne's obligation under a November 3, 2003 renewal lease to Virgil D. LaRosa, Sandra LaRosa, Jennifer Ward, Chris Ward and Andrea Pecora Fucillo, which renewal lease is considered below.

16.   The three plans of reorganization filed by the debtors in their bankruptcy proceeding at various times proposed that Cheyenne's operations would enable the debtors' estate to make continued payments of $7,000.00 a month for 60 months in order to repay the debtors' obligation to the plaintiffs.

17.   On April 17, 2009, the bankruptcy court converted the individual debtors' bankruptcy from a Chapter 11 proceeding to a liquidating proceeding under Chapter 7, after the individual debtors failed to file a third amended plan of reorganization.

A.   <u>Cheyenne Sales, Inc. and Regal Coal Company, Inc.</u>

18.   From April 1980 until May 2009, Cheyenne was a West Virginia corporation.  From August 1982 until his death on June 17, 2006, Virgil Benito LaRosa was the sole owner and shareholder of Cheyenne.

19.   Since its beginning, Cheyenne was in the business of tippling coal mined by others and buying raw coal mined by others in order to process it and sell it.

20.   The property upon which Cheyenne operated contains a coal washing plant, railroad tracks and tippling facilities.  Tippling

is the process whereby coal is loaded into railroad cars. The coal
washing plant processes the coal in order to make it a marketable
product.

21. In order to sell the washed coal, Cheyenne purchased raw
unprocessed coal from others and processed the coal through its
washing plant.

22. The Estate of Virgil B. LaRosa is a sole owner and
shareholder of Cheyenne's stock. Joan LaRosa became president of
Cheyenne upon the death of her husband. However, Joan LaRosa,
after her husband's death, deferred to Virgil D. LaRosa at his
suggestion regarding which creditors got paid first and Joan LaRosa
did not override any of Virgil D. LaRosa's decisions. From
testimony at Cheyenne's first meeting of creditors, it appears that
Virgil D. LaRosa had run that business for years and was most
familiar with Cheyenne's financial information.

23. Regal Coal Company, Inc. ("Regal") is a non-party in this
civil action. Regal was incorporated on or about August 21, 1984.
Virgil David LaRosa has been its sole shareholder.

24. Regal, as a Subchapter S corporation, passes through all
of its income and expenses to defendants Virgil D. LaRosa and
Sandra LaRosa.

25. Regal was initially capitalized for $50,000.00 from money
that Virgil D. LaRosa earned mowing lawns. A business relationship
has existed between Cheyenne and Regal since the 1980s and that

relationship did not change until Cheyenne went out of business in April 2009.

26.  Virgil Benito LaRosa during his lifetime negotiated the price for the sale of coal on behalf of Cheyenne and Virgil David LaRosa negotiated the price for the purchase of coal on behalf of Regal in those transactions that occurred between Cheyenne and Regal.  After Virgil Benito LaRosa's death, Virgil David LaRosa negotiated prices for the sale of coal between Cheyenne and Regal with Joan LaRosa.

27.  Under an agreement between Cherokee Processing, Inc. ("Cherokee"), a West Virginia corporation in which Virgil David LaRosa is the sole shareholder, and a third-party named Roblee, Roblee was required to pay Cherokee a royalty payment of 9% of the sales price of all tons of coal mined and sold by Roblee to Cheyenne.  Cheyenne received the benefit of the royalty because the purchase price of coal paid by Cheyenne to Roblee was reduced by the 9% royalty amount.

28.  Between October 2004 and September 2007, Regal advanced funds to Cheyenne on over 80 occasions for a total amount of more than $15 million.  On a number of occasions, Regal advanced funds to Cheyenne through the balance of outstanding paid advances exceeding $1 million.  Cheyenne used these advances to make payments to Roblee for coal and for capital improvements.

29.  Advances to coal suppliers are often considered normal and customary in the coal marketing business.  Regal also advanced money to companies not affiliated with Cheyenne.  Between 2000 and 2005, 25% to 30% of the total amount of coal purchased by Regal was purchased from Cheyenne.  Expert witnesses for the parties testified differently with respect to coal purchases by Regal from Cheyenne and the effect thereof.  Defendants' expert witness asserted that Cheyenne received $2.70 more per ton from Regal than Regal paid to other coal suppliers and that Regal did not operate its business to keep profits from Cheyenne.  Defendants' expert witness testified that Cheyenne received reasonably equivalent value for its coal sales to Regal.  On the other hand, plaintiffs' expert witness testified that $2,839,318.00 in coal sales from Cheyenne to Regal were not made for a reasonably equivalent value. For purposes of a complete ruling in this civil action, this Court does not believe that it is necessary to resolve this disputed testimony.

30.  Cheyenne operated a coal loading and processing facility in Upshur County, West Virginia which was referred to at the trial as the "Rawhide Tipple."

31.  Virgil D. LaRosa testified at trial that Cheyenne did not do the same things as Regal did because "that is not what Virgil B. LaRosa wanted."  (Trial Tr. 30:1-16, May 27, 2009.)

32.   When coal was purchased for Cheyenne, Virgil D. LaRosa visibly inspected the coal to determine the market value of coal and the general recovery rates for a particular seam of coal.

33.   Cheyenne charged its customers a separate price for tippling.

34.   In the past, Cheyenne washed "dirty" or "B" coal for parties other than Regal for which it would charge a separate fee for its service.  Cheyenne purchased either "B" or "C" coal that Cheyenne washed and sold as clean product to Regal.  Cheyenne allowed Regal to make sales to the ultimate customer rather than compete for that business because Virgil D. LaRosa, as he testified, was carrying out the wishes of Virgil B. LaRosa.

35.   While Virgil D. LaRosa was working for Regal, he was also working with Virgil B. LaRosa, during his lifetime, at Cheyenne. Regal's orders with end users required it to blend "clean" or "A" coal with washed "B" and "C" grade coals.  Regal did not have the ability to blend coal nor to wash "B" and "C" coals necessary to fulfill its contracts.

36.   In recent years (probably since 2000), anywhere from 99% to 100% of the coal that Cheyenne purchased, washed, tippled and sold was sold to Regal.  Prior to his death, Virgil B. LaRosa would negotiate the price at which Cheyenne would sell its "B" and "C" grade coal to Regal.  At the time when Joan LaRosa was the president of Cheyenne, Virgil D. LaRosa was probably doing the

negotiating on behalf of both Regal and Cheyenne for sales of "B" and "C" grade coal. Joan LaRosa never refused to accept the price that Virgil D. LaRosa proposed. Virgil D. LaRosa was Cheyenne's general manager. Virgil D. LaRosa asserted at trial that Cheyenne could not enter into contracts with end users, as Regal did, because of Cheyenne's bad reputation in the coal industry. However, he did not make this assertion until the time of trial.

37. Virgil D. LaRosa was responsible for numerous functions for Cheyenne. For Cheyenne, he assessed the quality of the coal, the recovery rate and the price Cheyenne paid for the coal. Also, Virgil D. LaRosa purchased the coal for Regal's purposes on behalf of Regal. Defendant Sandra LaRosa, wife of Virgil D. LaRosa, was hired around 1985 and performed secretarial services for Virgil B. LaRosa. Upon returning to Cheyenne around 1994, Sandra LaRosa had the same job duties as she had prior to leaving Cheyenne in 1988. Sandra LaRosa also worked for Regal in approximately the same capacity with the same job responsibilities as she had for Cheyenne. Her husband, Virgil D. LaRosa, testified that Sandra's job responsibilities were to perform secretarial work. Sandra LaRosa received a salary from Regal but not from Cheyenne.

38. Sandra K. LaRosa's wages from Regal for the years 2003 to 2007 were as follows:

| Year | Salary |
|------|--------|
| 2003 | $220,000.00 |
| 2004 | $164,000.00 |
| 2005 | $168,000.00 |
| 2006 | $ 90,000.00 |
| 2007 | $180,000.00 |
| 2008 | $184,000.00 |

39.   Virgil D. LaRosa had the authority to set the price Cheyenne pays for coal that it purchases.   Virgil D. LaRosa, as general manager of Cheyenne, sold the coal on behalf of Cheyenne and has been doing that since around 2002.   Virgil D. LaRosa purchased the coal for Regal's purposes on behalf of Regal.

40.   In July 2003, Virgil Benito LaRosa sold 10,000 shares of stock for approximately $105,100.00, depositing the proceeds from this transaction into Cheyenne's bank account which was then used to purchase part of what is hereafter referred to as "the second annuity."

41.   On July 18, 2003, just a little over two weeks after plaintiffs began serving suggestions of personal property to collect on their judgment, Virgil B. LaRosa transferred $386,589.56 of his personal funds to Cheyenne.   Cheyenne's ledger for Virgil B. LaRosa transactions indicates the deposit of $386.509.56 on July 18, 2003 and the deposit of $105,100.00 on July 28, 2003 into Cheyenne's accounts.   These transfers were also about five months before debtors filed for bankruptcy.

42.    Although Virgil B. LaRosa reportedly loaned money to Cheyenne in July 2003, there are no promissory notes or pledges of collateral between Virgil B. LaRosa and Cheyenne for these loans.

43.    The July 2003 transfers by Virgil B. LaRosa were made to Cheyenne, a company wholly-owned by Virgil B. LaRosa.  Before these transfers were made, the debtors were subject to an outstanding judgment liability to Joseph LaRosa and Dominick LaRosa.

44.    Virgil B. LaRosa, as sole shareholder of Cheyenne, retained control of the funds transferred to Cheyenne.

45.    The evidence shows that the debtors were insolvent or were rendered insolvent after the transfers were made.

B.    First and Second Annuities

46.    On June 26, 2003, Cheyenne drew $700,000.00 from its line of credit with Huntington National Bank and deposited it into its checking account.

47.    On or about July 15, 2003, within two weeks of the dates when the plaintiffs caused the suggestions of personal property to be served, Cheyenne issued a check in the amount of $700,000.00 drawn on Cheyenne's Huntington National Bank account payable to RBC/Businessman's Assurance Company of America.

48.    Between June 26, 2003 and July 15, 2003, Cheyenne deposited an additional $325,880.23 into its checking account and withdrew $236,878.94 from its checking account.

49.   On July 15, 2003, Cheyenne purchased an annuity from Businessman's Assurance Company for $700,000.00 ("first annuity"). Cheyenne was the sole owner of this annuity.  Sandra K. LaRosa was the named annuitant.  The funds used to purchase both annuities came from Cheyenne's checking account and from a draw on Cheyenne's line of credit.

50.   Virgil Benito LaRosa, according to Virgil David LaRosa, wanted Cheyenne to invest in an annuity to provide financial protection for a potential reclamation liability as a result of Cheyenne's operations on the land owned by defendants Andrea Fucillo, Jennifer Ward and Virgil David LaRosa.

51.   On or about July 18, 2003, within two weeks of the dates when the plaintiffs caused the suggestions of personal property to be served, Cheyenne issued a check in the amount of $240,000.00 drawn on Cheyenne's Huntington National Bank account payable to RBC/Businessman's Assurance Company of America.

52.   On July 23, 2003, Cheyenne purchased a second annuity from Businessman's Assurance Company for $240,000.00.  Sandra K. LaRosa was the named annuitant.

53.   On July 28, 2003, Virgil Benito LaRosa purportedly loaned Cheyenne $105,100.00.

54.   On or about July 28, 2003, within a month of when the plaintiffs caused the suggestions of personal property to be served, Cheyenne issued a check in the amount of $80,000.00 drawn

14

on Cheyenne's Huntington National Bank account payable to RBC/Businessman's Assurance Company of America. On or about July 31, 2003, RBC/Businessman's Assurance Company of America recorded the deposit of $80,000.00 into an annuity contract for Cheyenne, making the total amount of this annuity contract to be $320,000.00.

55. The initial annualized rate of return for both annuities was 3.00%.

56. Under the terms of the two annuities, there was a specific provision that withdrawal charges would be deducted from the amount surrendered from the annuities.

57. On September 27, 2004, more than thirteen months after Cheyenne purchased the annuities, Cheyenne withdrew $70,000.00 from the first annuity and $30,000.00 from the second annuity and deposited the $100,000.00 into its checking account.

58. Cheyenne used the $100,000.00 withdrawn from its annuities to pay outstanding West Virginia severance tax liabilities. On May 12, 2006, nearly three years after Cheyenne purchased the annuities, Cheyenne withdrew $100,000.00 from the first annuity and $100,000.00 from the second annuity. Cheyenne deposited $198,453.03 of the $200,000.00 into its checking account and paid $1,546.97 in surrender penalties. This withdrawal was for capital improvements at the "Rawhide Tipple."

On October 11, 2006, Cheyenne surrendered the first annuity for its full amount of $598,794.64. Cheyenne deposited $530,000.00

in its checking account and paid to Businessman's Assurance Company $68,794.64 as a surrender charge.

Between October 11, 2006 and October 16, 2006, Cheyenne made payments of $534,924.82 out of its checking account.

59. The May 12, 2006 entry in Cheyenne's checking account showing a deposit of $198,453.03 reflects the deposit of proceeds Cheyenne obtained from the two May 9, 2006 withdrawals from the annuities.

60. Prior to Virgil B. LaRosa's death, Cheyenne, Virgil D. LaRosa, Jennifer Ward and Andrea Pecora Fucillo signed a document in which Cheyenne, Joan LaRosa signing as president, requested permission of Virgil D. LaRosa, Jennifer Ward and Andrea Pecora Fucillo as leaseholders of the Cheyenne property to use $198,452.02 from the annuity accounts as of May 12, 2006. Also, Cheyenne, Virgil D. LaRosa, Jennifer Ward and Andrea Pecora Fucillo signed a document in which Cheyenne, Joan LaRosa signing as president, requested permission of Virgil D. LaRosa, Jennifer Ward and Andrea Pecora Fucillo as leaseholders of property where Cheyenne sales facilities were located, to use $530,000.00 from the annuity accounts as of October 9, 2006.

In 2006, Cheyenne incurred approximately $70,000.00 in surrender fees when it liquidated the annuities.

61. The proceeds from the withdrawal of the annuities were not spent for the reclamation project identified in the Renewal Lease discussed below.

62. The debtors were insolvent or became insolvent a short time after the annuities were purchased.

C. Renewal Lease

63. The "Rawhide Tipple" is the place where Cheyenne conducted its operations. It is located on land conveyed by deed to Virgil D. LaRosa, Jennifer LaRosa Ward and Andrea Pecora Fucillo by their grandfather, James D. LaRosa.

64. Virgil B. LaRosa had owned the preparation plant located at the Rawhide Tipple.

65. The renewal lease is a document admitted as Plaintiff's Exhibit No. 3 made as of January 1, 2003. Virgil D. LaRosa and Sandra K. LaRosa, his wife, Andrea Pecora, and Jennifer LaRosa Ward and Chris Ward, her husband, are lessors, Cheyenne Coal Sales, Inc. is the lessee and Virgil B. LaRosa and Joan LaRosa are collectively referred to as "Guarantor."

66. Since 1982, Cheyenne operated a coal loading and processing facility and operation on the land but had not paid the children, the landowners identified above, any rent for using the land.

67. No one ever asked Virgil D. LaRosa as a lessor what the rent under the renewal lease should be, whether there should be a

reclamation fee, nor who would determine the amount of the reclamation or how the $700,000.00 for the reclamation fee was to be determined.

68. Virgil Benito LaRosa did not report the alleged unpaid rent due the lessors under a purported oral lease for the land upon which the Rawhide Tipple is situated in Cheyenne's financial statements.

69. Virgil B. LaRosa never told Robert R. Frazier, a certified public accountant representing the LaRosa family and Cheyenne, about Cheyenne's $5,000.00 per month ($60,000.00 per year) rental obligation to the LaRosa children prior to 2003. Further, Frazier did not recall knowing about the existence of an oral lease for the land upon which the Rawhide Tipple was situated prior to 2003, which is the year the written renewal lease was prepared and signed.

70. The renewal lease provided that Cheyenne would deposit $700,000.00 into an interest-bearing account opened by the children and their spouses for reclamation costs associated with Cheyenne's operations on the property and that any excess monies in that account that were not required for reclamation would then be paid to the children and their spouses as deferred rent.

71. Prior to executing the 2003 renewal lease, Cheyenne made no effort to determine the reclamation cost for the land upon which the Rawhide Tipple is situated.

72.  The $700,000.00 reclamation fee called for under Paragraph 8 of the 2003 renewal lease was funded by the two annuities that in 2003 amounted to $1,0200,000.00.  Although Cheyenne placed that amount in annuities to comply with the renewal lease provision for the reclamation fee escrow, nearly all the monies were withdrawn and used for purposes other than reclamation. Although Cheyenne's financial statements for the years 1992 through 2004 disclosed an oral lease of the wash plant and tipple from Virgil B. LaRosa, there was no disclosure of any lease of real property.

73.  Although they are identified as lessors in the renewal lease, Sandra LaRosa and Chris Ward are not identified as owners of the real property set forth in the description of the property in the renewal lease.

74.  The renewal lease at paragraph 2 states that the initial term of the lease began in 1981 and that the lease had been in existence and continuance since 1981 and that the renewal lease is a memorialization and execution of the prior oral agreement between the parties.  The renewal lease at paragraph 3 establishes the rent for the initial term, a period from 1981 through November 2003, to be $5,000.00 per month.

75.  The renewal lease at paragraph 4 provides that all rent accruing should be deferred until certain additions occurred.  The renewal lease at paragraph 8 provides as follows:

The Lessee shall cause an amount equal to Seven Hundred Thousand Dollars ($700,000) to be deposited in an interest bearing account open by Lessors (the "Trust Account") for any and all reclamation costs associated with the money operations at the [Rawhide Tipple](the "Reclamation Fees").

    a.    The Trust Account shall provide that the deposited Reclamation Fees may only be withdrawn upon the signature of an authorized representative of both Lessee and Lessors.

    b.    The Reclamation Fees shall be disbursed from Trust Account to Lessors as is necessary to implement reclamation of the effected portion of the property in accordance with the reclamation plans approved by the West Virginia Department of Environmental Protection ("DEP"). Lessors shall only use the money in Trust Account for such reclamation purposes and shall provide Lessee with an accounting of all monies disbursed from the Trust Account within 45 days of any such disbursement.

    c.    Any excess monies that are required for reclamation shall be paid to Lessor as deferred rent.

    d.    The Lessee shall not have any right to sell, assign, pledge, mortgage or in any other manner encumber, alienate or dispose of the Trust Account, nor shall such Trust Account in any way become liable any indebtedness of the Lessee or be subject to any legal process, bankruptcy proceeding, or the claims, interference or control of the creditors of the Lessee.

76. Paragraph 22 of the renewal lease contains a guaranty provision with Virgil B. LaRosa and Joan LaRosa as guarantors.

77. The renewal lease was signed on November 3, 2003, four months after the plaintiffs began serving suggestions of personal

property in an effort to collect on their judgment as well as sixteen days before debtors filed for bankruptcy.

78. Chris Ward, Jennifer Ward, Andrea Pecora Fucillo and Sandra LaRosa knew nothing about the renewal lease until just before they signed it.

79. Virgil D. LaRosa testified that he signed the 2003 renewal lease because Virgil B. LaRosa wanted him and his siblings to sign the renewal lease. Chris Ward, Jennifer Ward and Andrea Pecora Fucillo, three of the lessors, indicated limited if any knowledge about the renewal lease, including the various terms and conditions thereof. Jennifer Ward and Andrea Pecora Fucillo testified that they signed the renewal lease because their father, Virgil B. LaRosa, requested them to do so and Chris Ward testified that he signed the renewal lease only because his wife, Jennifer Ward, requested that he do so. Sandra LaRosa did not believe that she read the renewal lease before signing and knew nothing about an account that was supposed to be funded with $700,000.00.

80. Virgil D. LaRosa did not know how the terms of the renewal lease were determined because he was not involved in the making of the renewal lease.

81. Pursuant to the terms of the renewal lease, Cheyenne posted reclamation bonds.

D.  Cheyenne's Line of Credit

82.  On January 25, 2001, the debtors pledged assets having a net value of $1,602,995.00 as collateral for a line of credit of $950,000.00.  On January 26, 2001, Cheyenne increased its line of credit with Huntington National Bank to $950,000.00.  This line of credit therefore encumbered the debtors' assets.

83.  This is not the first line of credit Cheyenne had obtained through Huntington National Bank or its predecessor banks. These lines of credit had been renewed on other occasions.

84.  The January 25, 2001 line of credit was collateralized from Cheyenne and the debtors by shares of stock and mutual funds, certificates of deposit, equipment, fixtures, and miscellaneous securities.  The line of credit was renewed on several occasions approximately every six months after it was extended and Huntington National Bank required the same amount of collateral even though the outstanding balance of the line of credit was between $300,000.00 and $400,000.00.  During that time, Huntington National Bank did not release any collateral from the line of credit.

85.  The interest rate on Cheyenne's line of credit with Huntington National Bank as determined by a January 30, 2001 Loan Facility Request was: prime – 1% adj. Daily.

86.  The outstanding balance on Cheyenne's line of credit was $684,230.08 on April 2, 2009, the date that Cheyenne filed for bankruptcy.

87. Virgil D. LaRosa testified that he guessed that Cheyenne's line of credit could have been used by Cheyenne to purchase sufficient amounts of coal to meet requirements of contracts that Regal had.

88. While there were times when the interest rate on the annuities described above and the interest rate on the line of credit were the same, the amount of money being earned on the annuities was never greater than the interest being paid on the line of credit.

89. The contents of each exhibit admitted during the trial are also adopted as parts of these findings of fact.

90. Any finding made by this Court which is not a finding of fact shall be deemed a conclusion of law.

### III. Conclusions of Law

1. Plaintiffs Joseph LaRosa and Dominick LaRosa have filed a three-count complaint against the above-named individual defendants and Cheyenne under the West Virginia Uniform Fraudulent Transfers Act. W. Va. Code §§ 40-1A-1, et seq. In Count I of their complaint, plaintiffs assert their claims under subsection 4(a)(1) of that Act; in Count II, plaintiffs assert claims under subsection 4(a)(2) of that Act; and in Count III, they assert claims under subsection 5(a)(1) of that Act.

At all times involved in this civil action, Joseph LaRosa and Dominick LaRosa have been creditors of the debtors as a result of

the above-described August 8, 1982 promissory note, which went unpaid, and the subsequent November 3, 1994 judgment entered in the United States District Court for Maryland against the debtors in the amount of $2,844,612.87 plus $10,000.00 in attorneys' fees for the unpaid August 1982 promissory note.

2.     Joseph LaRosa and Dominick LaRosa are creditors of the debtors as they have a claim against the debtors since the judgment gave the plaintiffs a right to payment from the debtors.  W. Va. Code § 40-1A-1(c)-(d).

3.     As of July 31, 2009, the amount of the judgment is $6,799,161.42 together with the $10,000.00 in attorneys' fees. Interest on that amount has accrued since July 31, 2009.  Debtors are liable to plaintiffs for this amount pursuant to West Virginia Code § 40-1A-1(e) (defining a "debt").  For purposes of the West Virginia Uniform Transfers Act, Virgil B. LaRosa and Joan LaRosa are debtors, liable to the plaintiffs for the judgment.  W. Va. Code § 40-1A-1(f) (defining a "debtor").

4.     For purposes of the West Virginia Uniform Fraudulent Transfers Act, Virgil D. LaRosa, Sandra LaRosa, Andrea Pecora Fucillo, Chris Ward, Jennifer Ward, Cheyenne, and Regal are insiders of the debtors pursuant to West Virginia Code § 40-1A-1(g)(1)(i), (iv), (k).

5.     Under the West Virginia Uniform Transfers Act, a "transfer" is defined as "every mode, direct or indirect, absolute

or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." W. Va. Code § 40-1A-1(l).

6. The debtors were insolvent from at least November 19, 2009 within the provisions of the West Virginia Uniform Fraudulent Transfers Act. W. Va. Code § 40-1A-2(a)-(b).

7. The Uniform Fraudulent Transfers Act enacted in West Virginia in 1986 was "designed to protect unsecured creditors against debtors who make transfers out of, or make obligations against, the debtor's estate in a manner adverse to the creditor's rights." Nicholas Loan & Mortg., Inc. v. W. Va. Coal Co-op, Inc., 547 S.E.2d 234, 238 (W. Va. 2001). The West Virginia Act was adopted from the Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1984.

8. Section 40-1A-4 of the West Virginia Code provides as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor;

(i)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) Intended to incur, or believed or reasonably should have believed that he (or she) would incur, debts beyond his (or her) ability to pay as they became due.

(b)  In determining actual intent under subdivision (1), subsection (a), consideration may be given, among other factors, to whether:

(1)  The transfer or obligation was to an insider;

(2)  The debtor retained possession or control of the property transferred after the transfer;

(3)  The transfer or obligation was disclosed or concealed;

(4)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)  The transfer was of substantially all the debtor's assets;

(6)  The debtor absconded;

(7)  The debtor removed or concealed assets;

(8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to the lienor who transferred the assets to an insider of the debtor.

W. Va. Code § 40-1A-4.

9.    Section 40-1A-4(b)(1)-(11) set forth above lists eleven factors that have been sometimes referred to as "badges of fraud" which can be indicative of a transfer with actual intent to hinder, delay or defraud any creditor of the debtor.    These statutory factors are neither exhaustive nor exclusive.    "Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."    <u>Gilchinsky v. National Westminster Bank N.J.</u>, 732 A.2d 482, 490 (N.J. 1999) (considering application of New Jersey Uniform Fraudulent Transfer Act).

10.    A court in reviewing a transaction in a fraudulent transfer case, should closely scrutinize transactions involving insiders.    <u>In re Jeffrey Bigelow Design Group, Inc.</u>, 956 F.2d 479, 484 (4th Cir. 1992).

11.    A transfer for which the debtor receives less than reasonably equivalent value is a "constructively fraudulent transfer."    What constitutes "reasonably equivalent value" must be determined from the standpoint of the debtor's creditors.    <u>Id.</u> at 484.

> The usual motive for transfers without reasonably
> equivalent value in exchange is to hinder creditors, and
> in fact such transfers ordinarily do hinder creditors.
> But such intent is difficult to prove, and the drafters
> of the Uniform Fraudulent Transfer Act included
> provisions addressing transactions that might be

considered wrongful toward creditors even if a debtor's
intent to hinder, delay, or defraud is not proven.  The
focus in 'constructive fraud' shifts from a subjective
intent to an objective result.

Badger State Bank v. Taylor, 688 N.W.2d 439, 447 (Wis. 2004)
(analyzing case under Wisconsin Uniform Fraudulent Transfer Act).

12.  A series of transactions under certain circumstances may
be "collapsed" and treated as a single transaction for the purpose
of determining whether there has been a fraudulent conveyance.  HBE
Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995).  Although
the concept of "collapsing" a series of transactions and treating
them as a single, integrated transaction has been applied primarily
when analyzing a transfer alleged to be fraudulent in the context
of a failed leveraged buyout ("LBO"), it has also been utilized in
other contexts.  In re Sunbeam Corp., 284 B.R. 355, 370 (Bankr.
SDNY 2002); In re Best Prods. Co., Inc., 157 B.R. 222, 229-30
(Bankr. S.D.N.Y. 1993) (citing LBO cases, then collapsing sublease
between subsidiary and parent corporation which was used as mere
financing vehicle and treating loan as having been made directly to
parent corporation); see also Orr v. Kinderhill Corp., 991 F.2d 31,
35-36 (2d Cir. 1993) (collapsing transactions concerning
corporation's (i) transfer of real property, and (ii) subsequent
distribution of stock in transferee corporation, and treating
integrated transaction as not supported by fair consideration).
"Where a transfer is actually 'only a step in a general plan,' an
evaluation is made of the entire plan and its overall

28

implications." In re Sunbeam Corp., 284 B.R. 370 (citing Orr v. Kinderhill, 991 F.2d at 35).

13.  Whether the transactions in this case are "collapsed" or not "collapsed," the result, under the circumstances in this case, would be the same.  In this case, Cheyenne is operated as a conduit through which a portion of debtor's wealth is passed on its way to defendants or others.  This fact does not transform debtor's property to the property of Cheyenne.

14.  Applying the above-stated findings of fact and analyzing them under the West Virginia Uniform Fraudulent Transfers Act, the transfers of Virgil B. LaRosa, during his lifetime, to Cheyenne of $386,509.00 on July 18, 2003 and $105,100.00 on July 28, 2003 at a time after the claim arose against the debtors were made with the actual intent to hinder, delay or defraud plaintiffs Joseph LaRosa and Dominick LaRosa and were, consequently, transfers fraudulent as to the plaintiffs under West Virginia Code § 40-1A-4(a)(1).  These transfers were made to an insider.  Prior to these transfers being made, debtors were indebted to plaintiffs Joseph LaRosa and Dominick LaRosa for the judgment which had not been satisfied.  These transfers were made within weeks after plaintiffs had served suggestions of personal property to try to collect on their judgment.  These transfers were not evidenced by any note or other written document.  There was no collateral and no interest rate charged.  During this time, Virgil B. LaRosa was the sole

shareholder of Cheyenne and thereby retained control of the funds transferred to Cheyenne. The consideration received by Virgil B. LaRosa was not of reasonably equivalent value. A portion of the proceeds from these transfers were used by Cheyenne to purchase annuities that were for the benefit of the individual defendants, all of whom were insiders under Cheyenne's reclamation obligation under the renewal lease described above. These transfers occurred shortly after Cheyenne incurred a debt in the form of a $700,000.00 drawn on its line of credit with Huntington National Bank. At this time, the debtors were insolvent or became insolvent shortly after the transfers were made. The transfers were made without receipt of reasonably equivalent value by Virgil B. LaRosa. Therefore, the plaintiffs are entitled to a judgment against defendants for $491,609.00 in connection with these July 2003 transfers.

15. Based upon the above-stated findings of fact applied to an analysis of the West Virginia Uniform Fraudulent Transfers Act, Cheyenne's draw down of $700,000.00 from Huntington National Bank on June 26, 2003 when Virgil B. LaRosa was the president and sole shareholder of Cheyenne, when its line of credit was secured with substantially all of the assets of debtors, was a transfer of debtor's assets that was made with the actual intent to hinder, delay and defraud plaintiffs and; therefore, the transfer was fraudulent as to the plaintiffs. This actual intent is shown by the fact that the $700,000.00 transfer was made by Cheyenne, a

company wholly-owned by Virgil B. LaRosa, an insider. Further, the proceeds from the $700,000.00 transfer remained under the control of the debtor, Virgil B. LaRosa, as president of Cheyenne. Prior to this transfer, plaintiffs had served suggestions of personal property and indexed their judgment against debtors in counties where debtors owned real property. This $700,000.00 transfer was not done for any legitimate business purpose. Further, the transfer increased the balance due on the line of credit to $919,000.00 and that balance had never exceeded $438,000.00. Thereafter, Cheyenne increased the line of credit to $950,000.00 in January 2001. Further, the average balance on the line of credit was never more than $238,000.00. This $700,000.00 transfer was entirely out of the ordinary since the average amount of Cheyenne's sixteen draws on the line of credit since January 25, 2001 was less than $30,000.00. The $700,000.00 transfer did not serve any ordinary business purpose but rather was done to encumber debtor's marketable securities which had been pledged to Huntington National Bank to secure debtor's guarantee of Cheyenne's line of credit. This transfer thereby placed the value of those securities beyond the reach of debtor's creditors, Joseph LaRosa and Dominick LaRosa. Finally, Cheyenne, at the time when Virgil B. LaRosa was president and sole shareholder of Cheyenne, used the proceeds from the $700,000.00 transfer to purchase an annuity which was pledged for the benefit of the defendants pursuant to Cheyenne's obligations

under the above-described renewal lease.  Consequently, plaintiffs are entitled to judgment against defendants in the amount of $700,00.00 plus any accrued interest pursuant to the West Virginia Fraudulent Transfers Act.

16.  The purchase of two annuities by Cheyenne with proceeds from Virgil B. LaRosa's July 2003 transfers to Cheyenne and the $700,000.00 draw on Cheyenne's line of credit with Huntington National Bank was for the benefit of the defendants as the annuities were used to satisfy Cheyenne's purported reclamation obligation to the individual defendants.  The individual defendants were required to authorize the subsequent withdrawals from the annuities for Cheyenne's ordinary business purposes.  These transactions involved in the purchase of the annuities were part of a plan to defraud the plaintiffs or to leave debtors without reasonably equivalent value.  The purchase of the $700,000.00 annuity was a transfer of debtor's assets made with actual intent to hinder, delay or defraud the plaintiffs and was a transfer that was fraudulent as to the plaintiffs.  This "actual intent" is shown by the fact that the purchase was made by Cheyenne, a company wholly-owned by Virgil B. LaRosa.  Also, the purchase of the annuity was made with proceeds from a line of credit collateralized with the debtor's assets which encumbered those assets and kept them away from the reach of their creditors, the plaintiffs Joseph LaRosa and Dominick LaRosa.  Prior to the purchase of the annuity,

the debtors had been sued by the plaintiffs and the annuity was purchased within weeks after the plaintiffs served suggestions of personal property to attempt to collect on their judgment. The purchase of the annuity was for the benefit of the individual defendants, all of whom were insiders, pursuant to Cheyenne's reclamation obligation under the renewal lease described above. Cheyenne's subsequent withdrawals from the annuity accounts were not used for reclamation purposes but instead were used for the benefit of Virgil D. LaRosa, an insider, and Regal, a company wholly-owned by Virgil D. LaRosa. Virgil B. LaRosa, as the sole shareholder of Cheyenne, retained control of the annuity purchased by Cheyenne. Finally, the debtors were insolvent or became insolvent shortly after the annuity was purchased.

17. Cheyenne's purchase of a $240,000.00 annuity, supplemented with an additional $880,000.00 purchase, came at a time after the claim of the plaintiffs arose against the debtors and was made with funds transferred to Cheyenne by Virgil B. LaRosa. This was a transfer of debtor's assets made with actual intent to hinder, delay or defraud Joseph LaRosa and Dominick LaRosa, the plaintiffs, and was a transfer that was fraudulent as to plaintiffs. The "actual intent" to delay, defraud or hinder Joseph LaRosa and Dominick LaRosa regarding these purchases and contributions to the second annuity with funds transferred to Cheyenne by Virgil B. LaRosa is shown by the fact that the purchase

was made by Cheyenne, a company wholly-owned by Virgil B. LaRosa. Further, the beneficiaries of the annuity Virgil D. LaRosa, Sandra LaRosa, Andrea Pecora Fucillo, Jennifer Ward and Chris Ward, were all insiders of the debtors. Also, prior to the purchase of the annuity, the debtors had been sued by Joseph LaRosa and Dominick LaRosa and the purchase of the annuities was made within a few weeks of the service of suggestions of personal property by the plaintiffs in an effort to collect on their judgment. In addition, the purchase of the annuity was made with funds transferred to Cheyenne by Virgil B. LaRosa which occurred within weeks after the plaintiffs had served suggestions of personal property in their effort to collect on their judgment. The purchase of the annuity was for the benefit of the individual defendants, all of whom are insiders, pursuant to Cheyenne's reclamation obligation under the renewal lease. Cheyenne's various withdrawals of a total of $828,453.03 from the annuity accounts were not used for reclamation purposes but rather for the benefit of Virgil D. LaRosa, an insider, and Regal, a corporation wholly-owned by Virgil D. LaRosa. At that time, Virgil B. LaRosa, as sole shareholder of Cheyenne, retained control of the annuity purchased by Cheyenne. Finally, the debtors were insolvent or became insolvent shortly after the annuity was purchased. For these reasons, plaintiffs would be entitled to judgment against the defendants in the amount of $1,020,000.00 plus accrued interest. However, such judgment will

not be entered as the Court will enter judgment in favor of the plaintiffs as set forth above against the defendants for the $1,191,609.00 previously requested for the July 2003 transfer of $491,509.00 and the $700,000.00 transfer.

18. Based upon the above findings of fact and this Court's analysis under the West Virginia Uniform Fraudulent Transfers Act, the debtor's agreement to guarantee Cheyenne's obligation to pay deferred rent under the renewal lease, totaling $1,655,000.00 as of December 31, 2008 and continuing to accrue at a rate of $5,000.00 per month to defendants under the November 2003 renewal lease, an obligation incurred after the claim arose against debtors and for which debtors did not receive any reasonably equivalent value causing this obligation to be undertaken, the debtors incurred or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due. This agreement by the debtors to guarantee Cheyenne's obligation to pay deferred rent amounting to $1,655,000.00 as of December 31, 2008 and continuing to accrue at a rate of $5,000.00 a month to defendants under the terms of renewal lease, was an obligation incurred after the claim arose against defendants for which debtors did not receive any reasonably equivalent value and was at a time when debtors were insolvent and thus was a transfer that was fraudulent as to plaintiffs under the West Virginia Uniform Fraudulent Transfers Act. Further, the guaranty agreement was made

at a time after the claim of the plaintiffs arose against debtors and constitutes a transfer that was fraudulent to plaintiffs with actual intent to hinder, delay or defraud plaintiffs. This actual intent is shown by the fact that the beneficiaries of the agreement to guarantee the deferred rent obligation were defendants, all of whom were insiders of the debtors. This guaranty agreement was incurred after debtors had been sued by plaintiffs, and the guaranty obligation was incurred approximately five months after plaintiffs' service of suggestions of personal property in their effort to collect on the judgment. Plaintiffs were insolvent or became insolvent shortly after they agreed to guarantee Cheyenne's rental obligations under the renewal lease as the agreement was executed sixteen days before debtors filed for bankruptcy. Significantly, the renewal lease purported to memorialize an alleged twenty-two year old oral lease about which none of the lessors knew anything. Further, Cheyenne's financial statements failed to disclose the existence of any such oral lease and the subsequent rental obligation for the real property upon which the tipple was situated until after the renewal lease was executed. The renewal lease was dated January 1, 2003 but was not executed until November 3, 2003. Testimony at trial shows that the individual defendants had no knowledge of the renewal lease or its terms, the alleged oral lease that it purported to memorialize, or the land covered by the renewal lease. The individual defendants

did not participate in any negotiations regarding the terms of the lease and testimony showed that the renewal lease was imposed upon them by Virgil B. LaRosa.  While the renewal lease identifies Chris Ward and Sandra LaRosa as lessors of the property in question and therefore beneficiaries of the rent guaranty, neither Chris Ward nor Sandra LaRosa had any ownership interest in the property in the renewal lease.  The $5,000.00 per month/$60,000.00 per year rental liability was not the product of negotiations between the parties and was more than six times greater than Cheyenne's average annual profits from 1992 through 2008.  Further, the rental liability bore no relationship to and was out of proportion to Cheyenne's profits. Rental liability also never appeared on the financial statements of Cheyenne until the debtors filed for bankruptcy even though the oral lease obligations of Cheyenne appeared in its financial statements from 1992 through 2002.  The renewal lease provided for the creation of a $700,000.00 environmental reclamation fee escrow although the parties to the lease did not consult any expert to determine what future reclamation liabilities for the effected property might be until this civil action was commenced even though Cheyenne's corporate designee testified that such consultation and study should have been performed before the renewal lease was executed.  Finally, the renewal lease calls for the creation of a $700,000.00 reclamation fee escrow even though Cheyenne posted nearly $200,000.00 in bonds in order to comply with the state

regulatory requirements for reclamation purpose.  Based upon the above findings, this Court will void all claims of the defendants against Cheyenne and the debtors arising out of or related to the renewal lease and the purported oral lease, pursuant to the West Virginia Uniform Fraudulent Transfers Act.

19.  Based upon the findings of fact and this Court's analysis under the West Virginia Uniform Fraudulent Transfers Act, this Court has examined the transactions between Cheyenne and Regal and regards these transactions as a transfer of assets away from the debtors.  Cheyenne was operated to avoid the accrual or distributions of substantial profits and other entitlements which could have been made available to the creditors of Virgil B. LaRosa, Joan LaRosa, or both of them, which creditors were the plaintiffs, Joseph LaRosa and Dominick LaRosa.

20.  The transactions between Cheyenne and Regal, whether or not "collapsed," must be viewed as a transfer of wealth away from the debtors because Cheyenne was operated so as to avoid the accrual or distributions of substantial profits and other opportunities or entitlements to either Virgil B. LaRosa, Joan LaRosa or both of them, which could have been made available to their creditors, in this case the plaintiffs, Joseph LaRosa and Dominick LaRosa.  Debtors either directed or permitted their son, Virgil D. LaRosa, to operate their business and that of Regal, their son's corporation, as essentially a single business

enterprise to transfer business opportunities and profits from Cheyenne to Regal in such a way as to hinder, delay and defraud the debtors' creditors, Joseph LaRosa and Dominick LaRosa, in their efforts to collect the judgment they had obtained from the debtors. Essentially, the transfer of business opportunities for profits from Cheyenne to Regal intentionally diverted value which should have inured to the benefit of the debtors to their son, Virgil David LaRosa and Sandra LaRosa, his wife. Diversions are transfers by the debtors pursuant to the provisions of the West Virginia Uniform Fraudulent Transfers Act. Debtors did not receive reasonable equivalent value in exchange for these profits and business opportunities from Cheyenne through Regal to Virgil David LaRosa and Sandra LaRosa. From 2003 through 2008, after the claim against debtors arose, Cheyenne, a corporation owned by Virgil B. LaRosa, the Estate of Virgil B. LaRosa and later Joan LaRosa, transferred substantial tons of washed "B" coal to Regal and Cheyenne through its shareholders and officers. The transfers were made with actual intent to hinder, delay or defraud Joseph LaRosa and Dominick LaRosa as creditors of the debtors. With regard to these transactions, the "actual intent" to delay, defraud or hinder Joseph LaRosa and Dominick LaRosa with respect to the sale of washed "B" coal to Regal in the above time period is shown by the fact that transfers were made to Regal, a company wholly-owned by Virgil D. LaRosa, an insider. Further, prior to these transfers,

the debtors had been sued by Joseph LaRosa and Dominick LaRosa, the plaintiffs. The consideration received by Cheyenne was not reasonably equivalent to the value of the washed "B" coal transferred because the profits Cheyenne received through these transactions with Regal during the years 2003 through 2008 were totally inconsistent with reasonable, arms-length, non-insider transactions. The transfers occurred after Cheyenne greatly increased its debt to Huntington National Bank as well as to Virgil B. LaRosa. Finally, the debtors were insolvent or became insolvent shortly after these transfers were made.

21. Based upon the evidence presented in this case, applied by the West Virginia Uniform Fraudulent Transfers Act, the defendants are not entitled to prevail under the ordinary course of business defense under West Virginia Code § 40-1A-8(f)(2). The Court concludes that considering applicable principles of equity and rules of civil procedure under the circumstances the renewal lease is deemed void, pursuant to West Virginia Code § 40-1A-7(a)(3)(iii).

22. This Court reaffirms its previous order enjoining each of the defendants by way of prohibiting the disposition of their property outside the ordinary course of business, the assets transferred or any other property. As provided under West Virginia Code § 40-1A-7(b), the plaintiffs may levy execution on the assets transferred or its proceeds.

23.  Plaintiffs Joseph LaRosa and Dominick LaRosa are hereby entitled to an attachment in their favor against Virgil D. LaRosa and Sandra LaRosa in the amount of $6,799,161.42, which is the amount of the original judgment, including accrued interest thereon as of July 31, 2009, plus continuing interest accruing thereon up to the date of this judgment, plus post-judgment interest pursuant to 28 U.S.C. § 1961 together with attorneys' fees of $1,019,874.15 as provided under the promissory note in the amount of 15%. (Pls.' Ex. 2., 94.)

24.  Plaintiffs Joseph LaRosa and Dominick LaRosa are awarded judgment against defendants Virgil D. LaRosa and Sandra LaRosa in the amount of $1,191,609.00, which is based upon the aggregate value of the cash infusion of $461,609.00 and the draw down of $700,000.00.

25.  Judgment is entered voiding all claims of defendants against Cheyenne and debtors arising out of the renewal lease, and the renewal lease is deemed void.

26.  All fraudulent transfers described above are deemed void.

27.  This Court declines to vacate this Court's earlier order of March 26, 2009 because it has not been provided with sufficient cause to do so.  In any event, this Court does not believe that the ruling would affect this Court's rulings set forth in these Findings of Fact and Conclusions of Law.

28.  Any conclusion by this Court which is not a conclusion of law shall be deemed a finding of fact.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:    September 15, 2010


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE